**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 19, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

KATHERINE G. AVERY,

　　　　Plaintiff-Appellant,

v.

MICHAEL J. ASTRUE, Commissioner
of Social Security Administration,

　　　　Defendant-Appellee.

No. 08-3207
(D.C. No. 6:07-CV-01263-MLB)
(D. Kan.)

---

**ORDER AND JUDGMENT**[*]

---

Before **MURPHY**, **McKAY**, and **ANDERSON**, Circuit Judges.

---

　　　　Plaintiff-appellant Katherine G. Avery appeals from an order of the district

court affirming the Commissioner's denial of her applications for Social Security

disability and Supplemental Security Income benefits (SSI).  She raises three

issues on appeal:  that the ALJ failed to properly (1) evaluate certain medical

opinion evidence; (2) take into account Ms. Avery's limited ability to use her

---

[*]　　　After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel.  It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

hands in determining her residual functional capacity (RFC); and (3) analyze

Ms. Avery's credibility. Because we determine that the ALJ properly evaluated

the medical evidence, that the ALJ's RFC determination was supported by

substantial evidence, and that the ALJ's credibility findings were "closely and

affirmatively linked to substantial evidence," *Kepler v. Chater*, 68 F.3d 387, 391

(10th Cir. 1995) (quotation omitted), we affirm.

I.

Appellant protectively filed her benefit applications on July 31, 2002,

alleging disability with an onset date of February 1, 2001. She initially claimed

disability based on post-polio syndrome; pain in her legs, hips, knees and ankles;

a lesion on her uterus; a problem with her kidneys; and gallstones. The agency

denied her applications initially and on reconsideration.

On March 24, 2004, appellant received a de novo hearing before an

administrative law judge (ALJ). Following the hearing the ALJ found that

Ms. Avery "is mildly obese and has club feet with degenerative arthritis of the

knees and ankles, [and] status-post multiple surgeries[.]" Aplt. App., Vol. 1,

Tab 3 at 38. The ALJ found that these impairments were severe but that they did

not meet or equal any of the criteria listed inthe Listing of Impairments at 20

C.F.R. Pt. 404, Subpt. P, App. 1 (Listings). The ALJ found that, considering

Ms. Avery's RFC, she was unable to perform her past relevant work as a chop-

saw operator or cook and was unable to perform the full range of sedentary work.

But the ALJ found that Ms. Avery was not disabled because she could make an adjustment to other work which existed in significant numbers in the national economy.

The district court subsequently reversed and remanded pursuant to an unopposed motion by the Commissioner and a second hearing was held before a different ALJ. Following that hearing, the ALJ found that the period of disability in question was from January 8, 2002, through the date of her decision.

The Commissioner follows a five-step sequential evaluation process to determine whether a claimant is disabled. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005) (describing steps). The claimant bears the burden of establishing a prima facie case of disability at Steps One through Four. *See id.* If the claimant successfully meets this burden, the burden of proof shifts to the Commissioner at Step Five to show that the claimant retains sufficient RFC to perform work in the national economy, given her age, education, and work experience. *See id.*

At Step Two of the sequential evaluation, the ALJ found that Ms. Avery

> has a "severe" combination of impairments, summarized as: Bilateral congenital club feet with a superimposed episode of poliomyelitis at age 2, which left her with cavus feet with tight heel cords and foot deformities more so on the right, status post multiple surgeries in childhood; post-polio syndrome; diffuse arthralgias in the back, knees and hips with objective evidence of mild degenerative changes; and high moderate (level II) to low extreme (level III) obesity; alcohol dependence/abuse, not per se "severe"; and history of kidney removal, September 30, 2002, not per se "severe."

-3-

Aplt. App., Vol. 2, Tab 3 at 519. The ALJ also found "no medically determinable impairment of carpal tunnel syndrome [(CTS)] during the period since January 8, 2002." *Id.*

At Step Three of the sequential evaluation, the ALJ found that Ms. Avery at no relevant time had an impairment or combination of impairments that met or equaled any of the criteria specified in the Listings.

As to Ms. Avery's credibility, the ALJ found

the claimant's testimony to be partially credible, particularly to the extent her lower extremity problems, particularly the pes cavus and great toe deformities (in combination with her obesity), preclude finding she can perform a job that requires much standing or walking. The [ALJ] otherwise finds her testimony to be exaggerated, e.g., as to her statement that she "frequently" attends a free clinic and her assertion at [the first] hearing that she lies down most of the day in bed or on the couch due to "excruciating pain."

Aplt. App., Vol. 2, Tab 3 at 530.

As to her RFC, the ALJ found that "the claimant's [RFC] since January 8, 2002, has been such that she can perform the full range of sedentary exertional work subject to environmental limitations against concentrated exposure to extreme cold and vibrations." *Id.*

At Step Four of the sequential evaluation, the ALJ found that Ms. Avery has been unable to perform any of her past relevant work since January 8, 2002. Finally, at Step Five the ALJ applied Rule 201.14 of the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, Subpt. P, App. 2, finding that since Ms. Avery

could be deemed to be age 50 as of March 1, 2007, she was disabled as of that date. Regarding the period from January 8, 2002, through February 28, 2007, the ALJ found that because Ms. Avery was a younger individual under the regulations at that time, and could perform work that existed in significant numbers in the national economy, she was not disabled. The Appeals Council denied review, making the ALJ's decision the Commissioner's final decision. The district court subsequently affirmed the Commissioner's decision and Ms. Avery has appealed.

Our jurisdiction over Ms. Avery's appeal is under 28 U.S.C. § 1291. *See* 42 U.S.C. § 405(g) ("The judgment of the [district] court shall be subject to review in the same manner as a judgment in other civil actions."). We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. *See Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted).

## II.

In her first point, Ms. Avery argues that the ALJ erred in evaluating Dr. Anthony Francis's medical opinion and, regarding the entire record, that the "ALJ's analysis of the medical evidence is wholly inadequate and does not provide substantial evidence to support a denial." Aplt. Br. at 16.

A.

Dr. Francis testified at the hearing that, based solely on the administrative record, it was his opinion that the impairments of Ms. Avery's knees and ankles met the level of the musculoskeletal Listing in § 1.02A, and the impairment caused by her pes cavus (dropped foot) or club foot equaled that Listing.

> 1.02 *Major dysfunction of a joint(s) (due to any cause):* Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1. § 1.02. In turn, § 1.00B2b provides:

> b. *What We Mean by Inability to Ambulate Effectively*
>
> (1) *Definition.* Inability to ambulate effectively means an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . .
>
> (2) *To ambulate effectively*, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk

-6-

without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

The ALJ asked Dr. Francis about the regulation's requirement that Ms. Avery not be able to ambulate effectively, noting that Ms. Avery had testified that she could walk a block or two. Dr. Francis responded: "I don't know that walking a block changes my opinion about that particularly. . . . I mean, we're kind of into the same thing that, you know, we've come to a lot of times, in other words, she meets the strict criteria of a listing, I mean, she either meets the listing or equals it and then, you know, there are other factors that are involved or may be involved." Aplt. App., Vol. 2, Tab 3 at 667. Then, under questioning by Ms. Avery's attorney, Dr. Francis talked about her pes cavus or club foot, saying: "And that's why I say that she would have the equivalent of a major weight bearing joint under 1.02A just on the basis of the pes cavus or drop foot or club foot." *Id.* at 669.

Dr. Francis also testified that her limitations were equivalent to the neurological Listings in §§ 11.04B, 11.07D, and 11.14.[1] Section 11.07D is the

---

[1]     As a technical point, we note that although Dr. Francis testified Ms. Avery "would meet *11.04B* and 11.07D as equivalent," (emphasis added) he might also have meant that her limitations were medically equivalent to the Listing in

(continued...)

Listing for cerebral palsy with "[d]isorganization of motor function as described in 11.04B." Section 11.14 is the Listing for peripheral neuropathies "[w]ith disorganization of motor function as described in 11.04B, in spite of prescribed treatment." Section 11.04 provides:

> 11.04 *Central nervous system vascular accident*. With one of the following more than 3 months post-vascular accident:
>
> . . . .
>
> B. Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C).

In turn, section 11.00C provides:

> C. *Persistent disorganization of motor function* in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combination, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

---

[1](...continued)
§ *11.14* as well. We shall treat his opinion as such because the issue regarding all of these sections is whether Ms. Avery had the requisite "[s]ignificant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station" described in § 11.04B.

Further, because it is mentioned by Ms. Avery in her brief, we note that the ALJ referenced § 1.04A a number of times in her decision. The context of the decision shows that this was simply a scrivener's error and that the ALJ intended to reference § 1.02A.

B.

In determining that Ms. Avery's impairments did not meet or equal the

Listing found at § 1.02A, the ALJ found

> no evidence, including in the claimant's testimony that she is "unable to ambulate effectively" as defined in section 1.00B2b. She does not use crutches or a cane, but she testified she may "sometimes . . . just grab a stick and use it when [she's] walking." There are no medical observations regarding any perceptive need for her to use any sort of assistive device or even orthopedic shoes. She testified she can walk a block and a half. She shops for groceries.

Aplt. App., Vol. 2, Tab 3 at 526 (citation omitted). The ALJ then specifically

discussed Dr. Francis's testimony and essentially held that the doctor had made a

legal error by concluding that the specific requirement that Ms. Avery be "unable

to ambulate effectively" was not necessary to a determination that Ms. Avery met

or equaled Listing 1.02A. The ALJ stated that she "f[ound] no support in medical

observations or complaints reflected in treatment records dated in the last 5 years

for the proposition that [Ms. Avery] has an 'inability to ambulate effectively'

within the regulatory meaning." *Id*.

In determining that Ms. Avery did not meet the neurological Listings found

at §§ 11.04, 11.07, or 11.14, the ALJ found: "the evidence in this case does not

establish a sufficient 'degree of interference with locomotion and/or interference

with the use of fingers, hands, and arms' to warrant finding a neurological listing

is met or equaled." *Id*. at 527 (quoting § 11.00C). As noted by the ALJ, in

eliciting Dr. Francis's opinion that Ms. Avery met one of these neurological

Listings, Ms. Avery's attorney directed Dr. Francis to a medical record from Dr. Daniel Dagen and asked whether that record showed that one of the Listings was met. In determining that the neurological Listings were not met, the ALJ noted that the consultative neurological examination in question was "remote"–it was from three years prior to the alleged onset of disability date. The ALJ also noted that Dr. Dagen had opined that, although Ms. Avery could not lift weights over twenty-five pounds, she had

> "no difficulty handling light objects and the coordination in her hands is reasonably good to near normal," which is consistent with an October 12, 2002, examination report stating the claimant's hobbies are painting and sewing. Dr. Dagen thought she would have difficulty standing more than 10 minutes or walking more than three blocks, which is compared to the claimant's testimony that she can stand at least 20 to 30 minutes and walk 1 ½ blocks.

*Id*. (citation omitted) (quoting Aplt. App., Vol. 1, Tab 3 at 258). The ALJ therefore found that the neurological Listings were not met, specifically noting that Ms. Avery's attorney had not presented any more recent medical records to support her argument.

C.

Ms. Avery argues that the ALJ committed a number of errors in determining that she did not have an impairment or combination of impairments that met or equaled any of the criteria specified in the Listings. All but one of Ms. Avery's arguments in her first point deal with the ALJ's treatment of Dr. Francis's medical testimony. She argues that, in rejecting Dr. Francis's

contention that the Listings at issue were met or equaled, the ALJ (1) failed to properly apply 20 C.F.R. §§ 404.1527 and 416.927 and Social Security Rulings (S.S.R.) 96-5p and 96-6p (all dealing with the evaluation of medical opinion evidence), (2) failed to explain the weight she gave Dr. Francis's opinion, (3) substituted her own medical judgment for that of Dr. Francis; (4) failed to "sufficiently explain why she rejected significant probative and uncontroverted evidence in the record indicating that [Ms.] Avery's combination of impairments met and/or equaled the listings," Aplt. Br. at 10; (5) failed to address Dr. Francis's opinion that her impairments were medically equivalent to those found in the Listings, and (6) "fail[ed] to provide specific, legitimate reasons for rejecting Dr. Francis' opinion," *id*. at 16.  Ms. Avery also generally argues as to the entire record that "the ALJ's analysis of the medical evidence is wholly inadequate and does not provide substantial evidence to support a denial." *Id*. We disagree with all these points of error.

First, we note that Ms. Avery presents no specific argument that the ALJ misinterpreted what it means to be unable to "ambulate effectively" under § 1.00B2b, or what "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station," means under §§ 11.04B and 11.00C.  Her argument is that the ALJ did not properly evaluate the evidence.

-11-

Second, it is important to specifically describe Dr. Francis's testimony. He began his testimony by noting that he had no doctor/patient relationship with Ms. Avery and that he was therefore testifying purely from his examination of the administrative record. He then proceeded to narrate from portions of the record describing the various diagnoses of Ms. Avery's physicians. The great majority of this narrative was simply a list of Ms. Avery's medical conditions with no discussion of how they affected her ability to function. In fact, the little discussion of limitation that *was* present was nothing more than recitation of Ms. Avery's subjective complaints found in the records: e.g., "now is having severe pain in all joints," "has aching in the legs from the hips down associated with prolonged standing," "[w]hen she was working her legs were miserably achy at the end of the day," she is having "hip, knee, ankle and back pain." Aplt. App., Vol. 2, Tab 3 at 664-66. Following this narration, Dr. Francis concluded that Ms. Avery's impairments met the level of the Listing in § 1.02A, with no discussion of how he arrived at his conclusion. As noted previously, when specifically questioned about the requirement that Ms. Avery not be able to ambulate effectively, Dr. Francis first seemed surprised that Ms. Avery had testified that she could walk a block or two, and then testified without explanation that her ability to do so would not change his opinion.

Ms. Avery's attorney then asked Dr. Francis to review the medical record from Dr. Dagen, specifically a section where the doctor found "a profound

weakness and drop foot that effects gait and ability to walk any distance." *Id.* at 668. The attorney then asked whether Ms. Avery might therefore meet the Listing in § 11.14. Dr. Francis proceeded to examine sections 11.14, 11.04B, and 11.07D, and testify, again in a conclusory manner, essentially that Ms. Avery's limitations would be equivalent to all three in that she had the "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station," required by 11.04B.

This detailed review of Dr. Francis's testimony shows that although he clearly expressed his medical opinion as to the various medical conditions afflicting Ms. Avery, he left unstated any medical opinion as to the nature and severity of the impairments caused by those conditions. Instead, he gave opinion on issues specifically reserved to the Commissioner, namely that these unstated impairments met or equaled the impairments in the Listings at issue. *See* 20 C.F.R. §§ 416.927(e)(2) ("Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments . . . , the final responsibility for deciding these issues is reserved to the Commissioner."); 416.927(e)(3) ("We will not give any special significance to the source of an opinion on issues reserved to the Commissioner . . . .").

Turning to Ms. Avery's claims of error, she first claims that the ALJ failed to properly apply 20 C.F.R. §§ 404.1527 and 416.927 and S.S.R. 96-5p and 96-6p.[2] Specifically she claims the ALJ failed to explain the weight she gave Dr. Francis's opinion, "fail[ed] to provide specific, legitimate reasons for rejecting Dr. Francis' opinion," Aplt. Br. at 16. substituted her own medical judgment for that of Dr. Francis, failed to address Dr. Francis's opinion that her impairments was the medical equivalent of those found in the Listings, and failed to "sufficiently explain why she rejected significant probative and uncontroverted evidence in the record indicating that Avery's combination of impairments met and/or equaled the listings," *id.* at 10. None of these arguments have merit.

First, Dr. Francis's opinion that Ms. Avery's impairments met or equaled the impairments in the Listings at issue were not ignored. *See* S.S.R. 96-5p, 1996 WL 374183, at *3 ("[O]pinions from any medical source on issues reserved to the Commissioner must never be ignored."). In fact, his opinion was extensively discussed. As to the weight the ALJ gave this opinion, it is clear it was rejected because the ALJ found the Listings were *not* met or equaled.

---

[2] Sections 404.1527 (disability insurance) and 416.927 (supplemental security income) set forth the requirements for evaluating opinion evidence; S.S.R. 96-5p clarifies the Social Security Administration's policy "on how [it] consider[s] medical cource opinions on issues reserved to the Commissioner"; and S.S.R. 96-6p clarifies the Social Security Administration's policy "regarding the consideration of findings of fact by State agency medical and psychological consultants and other program physicians and psychologists" by ALJs.

As for the claims that the ALJ failed to provide specific, legitimate reasons for rejecting Dr. Francis's opinion, substituted her own medical judgment for his, and failed to explain why she rejected significant probative and uncontroverted evidence that Ms. Avery's combination of impairments met or equaled the Listings at issue,[3] we note that "[i]f the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." S.S.R. 96-5p, 1996 WL 374183, at *3. That is just what the ALJ did. In the same ruling the Social Security Administration (SSA) stated that "[w]hether the findings for an individual's impairment meet the requirements of an impairment in the listings is usually more a question of medical fact than a question of medical opinion." *Id.* Further, "[i]n most instances, the requirements of listed impairments are objective, and whether an individual's impairment manifests these requirements is simply a matter of documentation." *Id.* In this case, the ALJ turned to the documentation from the treating sources regarding Ms. Avery's impairments and to Ms. Avery's own testimony regarding her limitations in determining that the Listings were not met or equaled. This was not error.

---

[3]     We assume Ms. Avery means Dr. Francis's testimony when she refers to "significant probative and uncontroverted evidence" being rejected. Aplt. Br. at 10. She does not identify any other evidence to which she might be referring.

We turn next to Ms. Avery's claim that the ALJ failed to address Dr. Francis's opinion that her impairments were medically equivalent to those found in the Listings.[4] Equivalence is a decision "'on medical evidence only' because this finding does not consider the vocational factors of age, education, and work experience." *Id*. at *4 (quoting 20 C.F.R. §§ 404.1526 and 416.926).

The regulations provide that medical equivalence can be found in three ways. First, if the claimant has an impairment that is described in the Listings, but the claimant (1) does not exhibit one or more of the findings specified in that Listing, or (2) exhibits all of the findings, but one or more of the findings is not as severe as specified in the particular Listing, the Commissioner will find that the claimant's impairment is medically equivalent to that Listing if the claimant has other findings related to his or her impairment that are at least of equal medical significance to the required criteria. *See* 20 C.F.R. § 404.1526(b).

---

[4]     In S.S.R. 96-5p, the SSA ruled regarding medical opinions on the issue of medical equivalency that

> [a] finding of equivalence involves more than findings about the nature and severity of medical impairments. It also requires a judgment that the medical findings equal a level of severity set forth in 20 CFR 404.1525(a) and 416.925(a); i.e., that the impairment(s) is ". . . severe enough to prevent a person from doing any gainful activity." This finding requires familiarity with the regulations and the legal standard of severity set forth in 20 CFR 404.1525(a), 404.1526, 416.925(a), and 416.926. Therefore, it is an issue reserved to the Commissioner.

1996 WL 374183, at *4.

Second, if the claimant has an impairment that is not described in the Listings, the Commissioner compares the claimant's findings with those for closely analogous listed impairment and, if the findings related to the claimant's impairment are at least of equal medical significance to those of a listed impairment, the Commissioner will find that medical equivalence. *Id.* Third, if the claimant has a combination of impairments, no one of which meets a Listing, the Commissioner compares the claimant's findings with those for closely analogous listed impairments and if the findings related to the claimant's impairments are at least of equal medical significance to those of a listed impairment, the Commissioner will find the combination of impairments medically equivalent to that Listing. *Id.*

Although Dr. Francis did not specify how he reached his medical equivalency determination, under any of the three options he would have to have found that the medical findings regarding Ms. Avery's impairments were of equal medical significance to the required criteria of a listed impairment. After considering the evidence in the record, the ALJ determined that the required functional limitations of being unable to "ambulate effectively" under in § 1.02A, *see* Aplt. App., Vol. 2, Tab 3 at 526, and–regarding the suggested neurological Listings–having the required "degree of interference with locomotion and/or interference with the use of fingers, hands, and arms" described in 11.00C, *see id.* at 527, were not met or equaled. Thus, the ALJ clearly rejected Dr. Francis's conclusory opinion on equivalency, an issue reserved to the Commissioner. As

-17-

Dr. Francis did not testify as to the medical findings or reason behind his equivalency opinion, nothing more was required of the ALJ.

Finally, Ms. Avery generally argues as to the entire record that "the ALJ's analysis of the medical evidence is wholly inadequate and does not provide substantial evidence to support a denial." Aplt. Br. at 16. Her argument is:

> When evaluating the medical evidence, the ALJ cited to and provided a discussion of the medical record. However, the ALJ never indicated whether she accepted or rejected statements made in the medical exhibits. When, as here, an ALJ does not provide any explanation for rejecting medical evidence, this court cannot meaningfully review the ALJ's determination.

*Id*. (citation omitted). Ms. Avery does not provide examples of the favorable medical evidence she alleges was improperly rejected. Our independent review of the ALJ's decision shows significant discussion of the record surrounding the ALJ's analysis regarding her alleged CTS, the Listings, and her credibility. Sufficient findings were therefore clearly made to allow meaningful review of the three issues raised on appeal.

III.

In her second point, Ms. Avery argues that the ALJ erred by not including limitations on the use of Ms. Avery's hands in making her RFC determination. Ms. Avery notes that although the ALJ found she could perform a full range of sedentary exertional work, S.S.R. 96-9p rules that unskilled sedentary exertional work requires good use of the hands and the ability to perform repetitive tasks

with the hands, abilities she argues she does not posess.  We disagree, holding that the ALJ's decision was supported by substantial evidence.

The ALJ spent considerable effort in analyzing Ms. Avery's CTS claim, and determining the evidence did not support finding a "medically determinable impairment of [CTS] during the period since January 8, 2002."  Aplt. App., Vol. 2, Tab 3 at 519.  The ALJ noted that Ms. Avery made no formal claim of CTS at the first hearing, claiming only that her right hand had a tendency to get numb.  She made only one claim of CTS in her written disability claims, asserting she needed help with pots and pans due to weak wrists from CTS.  The ALJ also noted that at the second hearing Ms. Avery testified that CTS was first diagnosed at a consultative disability examination and CTS surgery had not been recommended.  Turning to the administrative record, the ALJ noted that a consultative examination performed in 2001 found her upper extremity evaluation "essentially normal," with right hand grip strength of 60 pounds and left hand grip strength of 70 pounds; that an October 2, 2002, evaluation did not mention any hand complaints or problems; and that a further evaluation ten days later showed complaints unrelated to hand problems, a right hand grip strength of 10 pounds and left hand grip strength of 40 pounds, but no CTS diagnosis. *Id*. at 524 (quotation omitted).  The ALJ found that the CTS was not a severe impairment during the claimed period of disability "with particular attention to the dearth of CTS complaints in claimant's written allegations of disability and

the lack of CTS complaints on examination and in treatment during the past 5 years." *Id.* at 525.

Ms. Avery claims the ALJ failed to properly consider certain medical records. She points first to a 1998 record from Dr. Dagen, wherein she was diagnosed with "[CTS], bilateral–moderately severe." *Id.*, Vol. 1, Tab 3 at 257. First, we note that Dr. Dagen's medical record was from a number of years prior to the alleged period of disability, and that, although the ALJ acknowledged "remote" diagnoses of CTS, she discounted them due to lack of recent CTS complaints in the more recent records. *Id.*, Vol. 2, Tab 3 at 525. Second, Dr. Dagen also found

> Her more recent onset upper extremity symptoms are due to [CTS], which is present bilaterally. The patient has weakness in her arms secondary to her remote motor neuron disease, i.e. poliomyelitis. This has resulted in dyscoordination of her hands and some weakness, making it impractical for her to lift or carry objects weighing more than 25 pounds. The patient has no difficulty handling light objects and the coordination in her hands is reasonably good to near normal.

*Id.*, Vol. 1, Tab 3 at 258. The ALJ's RFC was for sedentary work, which "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567. This is well within Dr. Dagen's finding that she could not lift or carry objects weighing more than twenty-five pounds. Third, although S.S.R. 96-9p ruled that "[a]ny *significant* manipulative limitation of an

individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base," 1996 WL 374185, at *8 (emphasis in original), Dr. Dagen found that Ms. Avery "ha[d] no difficulty handling light objects and the coordination in her hands is reasonably good to near normal," Aplt. App., Vol. 1, Tab 3 at 258.

Ms. Avery also directs this court to a 2003 evaluation by Dr. T. M. Venkat that showed that she had a right hand grip strength of 20 pounds and left hand grip strength of 40 pounds. *Id.*, Vol. 2, Tab 3 at 435. But there is no diagnosis of CTS, no record of any complaint regarding her ability to use her arms, and Dr. Venkat found "[t]he patient does not have any difficulty in picking up the coin or opening the door. The patient is able to write her name without any difficulty." *Id.*

Ms. Avery next points to a November 2001 medical record, also prior to the onset of disability date, from Dr. Arun Sharma. The record shows that she reported her *left* hand tingling, getting numb, and hurting and that she was not able to lift things at times. *Id.*, Vol. 1, Tab 3 at 344. Dr. Sharma diagnosed "LEFT HAND PAIN WITH PROBABLE [CTS]," although the examination section of the record does not show any examination of Ms. Avery's upper extremities. *Id.*

Finally, Ms. Avery claims that the ALJ did not properly evaluate her subjective claims with regard to her alleged CTS. She testified at the second

hearing that she had CTS; that she took Tylenol to treat it; that the CTS caused her hands and fingers to "lock up," *id.*, Vol. 2, Tab 3 at 658; and that she had tingling in both arms to her shoulders two to three, and maybe more, times a day, *id.* at 660. When she was asked whether anyone had recommended surgery for her CTS, she said no, but claimed she had "been seeing the free clinic here frequently." *Id.* at 658. The ALJ, following the framework set forth in *Luna v. Bowen*, 834 F.2d 161 (10th Cir. 1987), determined that there was "at least a 'loose nexus' between the claimant's impairments and her subjective allegations." Aplt. App., Vol. 2, Tab 3 at 528. But as to her subjective complaint regarding her CTS symptoms–i.e., tingling in both arms to her shoulders two to three, and maybe more, times a day–the ALJ found that her testimony was undermined by her claim that she was being seen frequently at a "free clinic" for her CTS. The ALJ found this claim was quite exaggerated since the newest medical record in the administrative record was from May 2005, almost a year prior to the second hearing, and that she had been seen for treatment only once in 2003. *Id.* at 529.

From the above, we hold that the ALJ's decision not to include any manipulative or repetitive motion limitations in Ms. Avery's RFC to account for her alleged CTS was supported by substantial evidence, in that there was "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty*, 515 F.3d at 1070 (quotation omitted). Ms. Avery's only claim of CTS in her written disability forms alleged that it made her wrists weak

so that she needed help with pots and pans. But the RFC, with its limitation to sedentary work, took into account Ms. Avery's inability to lift and carry heavy objects. As to the requested manipulative or repetitive motion limitations, even the older medical records that diagnosed CTS do not support such limitations, and the newer records do not diagnose CTS.

IV.

In her third and final point, Ms. Avery complains in a conclusory manner that the ALJ erred in finding her not fully credible. Citing *Kepler*, 68 F.3d at 391 ("[F]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings") (quotation omitted), she directs this court to page 516 of Vol. 2, Tab 3, of her appendix, and asserts that the ALJ simply stated that she considered Ms. Avery's subjective complaints without providing a more detailed analysis. This is a mischaracterization of the record. The ALJ's decision spent a number of pages analyzing credibility, *see* Aplt. App., Vol. 2, Tab 3 at 527-30, and the ALJ was very specific as to what parts of Ms. Avery's testimony she found exaggerated, and why. Further, page 516 does not reference either credibility or Ms. Avery's subjective complaints.

Ms. Avery goes on to argue that the ALJ "based her pain and credibility determinations on mistaken observations from the record," Aplt. Br. at 21, without identifying any of the allegedly mistaken observations. She then closes

by reiterating her first conclusory assertion, arguing: "Although the ALJ stated she considered [Ms.] Avery's subjective complaints, she did not provide a sufficient discussion on how the evidence related to her analysis nor her ultimate conclusion that Avery's allegations were significantly greater than indicated in the medical record." *Id.*

As our independent review of the record shows that the ALJ's credibility findings were "closely and affirmatively linked to substantial evidence," *Kepler*, 68 F.3d at 391, this point is denied.

V.

The judgment of the district court is AFFIRMED.

Entered for the Court

Michael R. Murphy
Circuit Judge